Argued and submitted January 6, decision of Court of Appeals reversed, and case remanded to Court of Appeals for further proceedings August 10, 2000

## STATE OF OREGON,
*Petitioner on Review,*

*v.*

## DOUGLAS LEROY RIDDLE,
*Respondent on Review.*

(CC 95CR3069FE; CA A93789; SC S46170)

8 P3d 980

Richard D. Wasserman, Assistant Attorney General, Salem, argued the cause for petitioner on review. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Walter J. Ledesma, Deputy Public Defender, Salem, argued the cause for respondent on review. With him on the brief was David E. Groom, Public Defender.

Charles S. Tauman, Portland, filed a brief for *amicus curiae* Oregon Trial Lawyers Association.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, and Leeson, Justices.**

GILLETTE, J.

---

** Kulongoski and Riggs, JJ., did not participate in the consideration or decision of this case.

## GILLETTE, J.

In this criminal case, we are asked to decide whether a defendant may prevent an accident reconstruction expert, whom the defense originally had hired to investigate the accident on which the criminal charges were based, from testifying for the state about an opinion that the expert formed while in the defendant's employ. We hold that a privilege to prevent such an expert from testifying altogether cannot be based solely on the fact that the state offers the expert testimony against the party that originally employed the expert. On the specific facts before us, we affirm the ruling of the trial court that allowed the expert in this case to testify and reverse the contrary decision of the Court of Appeals.

The relevant facts are as follows: While defendant was driving across a bridge on a highway in Douglas County, his pickup truck crossed the center line and struck an oncoming car. The collision killed two of the occupants of the oncoming car; two others were injured. Field sobriety tests performed at the scene, and other physical tests performed later, indicated that defendant was under the influence of alcohol at the time of the accident. Defendant was charged with two counts of manslaughter, ORS 163.118, one count of driving while intoxicated, ORS 813.010, and other crimes.

At defendant's trial, the state in its case-in-chief called an accident reconstruction expert who testified that, in his expert opinion, the cause of the accident was that defendant had taken the turn before the bridge too fast, crossed the center line, overcorrected, and "spun out of control," causing the side of his truck to strike the oncoming car. The defense, in its case-in-chief, also called an accident reconstruction expert, who opined that defendant had lost control of his vehicle because the steering mechanism had become locked. The state then sought to introduce the testimony of a third accident reconstruction expert, Myers, to rebut the testimony of defendant's expert. Defendant's lawyer objected to Myers's testimony on the ground that Myers's opinion was privileged, because the defense originally had hired Myers to determine the cause of the accident.

The prosecutor acknowledged that he was aware of Myers's previous connection with the defense and explained that he had discovered that connection when he attempted to hire another reconstruction engineer from Myers's firm. The prosecutor also explained that he had learned of Myers's theory of the crash during informal settlement negotiations with defendant's original lawyer, Bouck, and had contacted Myers at that time, because Myers's theory seemed to be substantially similar to that of the state's own accident reconstruction expert. Myers, the prosecutor reported, had disclosed his opinion about the crash after "check[ing] to make sure that it was not based on any privileged communication, that he didn't base it on anything that the defendant had said."

Defendant's lawyer argued that Bouck in fact *had* conveyed privileged material to Myers and that Myers "at the very least [was] tainted by that." The court then invited the parties to put on whatever testimony that they wished to present in the matter, including Bouck's testimony.

Bouck testified *in camera* on behalf of defendant. He stated that he had retained Myers for consultation purposes—to analyze the data and give his opinion about what had caused the accident. Bouck stated that he and his investigator had accompanied Myers to the site of the crash to take measurements and gather data, that he had discussed a few potential theories of the crash with Myers, and that he had related to Myers at least one statement that defendant had made to Bouck. Bouck testified that Myers had reported his opinion orally and that Bouck did not ask for or receive a written report. On cross-examination, Bouck and the prosecutor engaged in the following colloquy:

"Q. Did [Myers] indicate to you what part if at all your communication to him of what your client might have said had played a part in his opinion as to what occurred?

"A. Not in so many words. He said basically he's going to look at this and he's going to tell me scientifically what his opinion was as to what happened.

"Q. Based on the physical evidence, not on what someone might have said?

"A. Yeah. He was going to tell me what he—what his opinion [was] based on measurements and things he saw, he was going to tell me, he said good or bad he was going to let me know what it is."

After Bouck testified, the trial court indicated that neither the fact of Myers's previous employment by defendant nor any statements that defendant had made to his lawyer or to Myers were admissible, but that the court was open to persuasion about the remainder of Myers's testimony. After hearing the parties' arguments, the trial court ruled that Myers would be allowed to testify with some restrictions: Myers could not mention any prior connection with the defense, he could not refer to any statements made by defendant or to information that came from defendant, and he could not refer to any statements that he had made to Bouck.

Myers testified the next day as part of the state's rebuttal, limiting his testimony in the manner that the trial court required. After Myers testified and the state concluded its rebuttal, the jury found defendant guilty of two counts of criminally negligent homicide (lesser-included offenses to the manslaughter charges), two counts of fourth-degree assault, and one count of driving while under the influence of intoxicants.

Defendant appealed, assigning error to the trial court's decision to permit Myers to testify.[1] Defendant argued that Myers's opinion regarding the cause of the crash was privileged, either under the attorney-client privilege or as attorney work product. A majority of the Court of Appeals, sitting en banc, agreed with defendant that Oregon law "extends the attorney-client privilege to the opinions of non-testifying experts who rendered those opinions in anticipation of litigation" and, therefore, reversed. *State v. Riddle*, 155 Or App 526, 536, 964 P2d 1056, *mod on recons* 156 Or App 606, 969 P2d 1032 (1998). We allowed the state's petition for review.

[1] Defendant also assigned error to the trial court's exclusion of certain evidence under OEC 403. The Court of Appeals did not address that assignment of error, because it reversed the trial court on the basis of defendant's first assignment.

■      At trial, and in the course of this appeal, defendant has offered alternative sources for his claim of privilege respecting Myers's testimony: OEC 503 (the attorney-client privilege) and the "work-product" doctrine. We begin with defendant's argument regarding the attorney-client privilege, which the Court of Appeals accepted as a proper ground for excluding Myers's testimony. The Court of Appeals' theory in that regard appears to rest on the notion that OEC 503 incorporates some aspects of the common-law work-product doctrine, including what that court characterized as the "majority view" that the opinions of nontestifying experts are protected by a "work-product" privilege. *Riddle*, 155 Or App at 534-35. The Court of Appeals' majority opined that some variant of that "majority view" was adopted in a pre-Oregon Evidence Code case, *Brink et ux v. Multnomah County*, 224 Or 507, 356 P2d 536 (1960), and that the approach of *Brink* is "reflected in the plain language of OEC 503 [and] the legislative commentary on OEC 503." *Riddle*, 155 Or App at 540.

Because OEC 503 is the statutory embodiment of the attorney-client privilege in this state, it is the necessary starting point for any discussion of the scope of that privilege. Accordingly, we turn to OEC 503, beginning with its text and context. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993) (describing methodology). OEC 503(2) sets out the attorney-client privilege. It provides, in part:

"(2)   A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:

"(a)   Between the client or the client's representative and the client's lawyer or a representative of the lawyer;

"(b)   Between the client's lawyer and the lawyer's representative[.]"

OEC 503(1)(b) defines "confidential communication" for purposes of subsection (2) as

"a communication not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or

those reasonably necessary for the transmission of the communication."

OEC 503(1)(e) defines "representative of the lawyer" as "one employed to assist the lawyer in the rendition of professional legal services."

In this case, there can be no doubt that Myers qualifies as a "lawyer's representative" for purposes of OEC 503(2). Bouck employed Myers to assist in developing defendant's side of the case. Neither is there any doubt that Myers and Bouck engaged in confidential communication with one another or that the purpose of that communication was to "facilitat[e] the rendition of professional legal services." The only question with regard to the application of OEC 503(2) is whether Myers's testimony contained or consisted of "confidential communications" within the meaning of the rule.

Defendant and the Court of Appeals' majority construe OEC 503(2) to mean that any testimony by Myers about the *subject* that defendant had hired him to investigate falls within the attorney-client privilege. Translated into the terminology of OEC 503(2), the question thus becomes: Are Myers's opinions and observations regarding the crash "confidential communications" within the meaning of OEC 503(2)(a) *solely* because Myers developed and communicated them to defendant's lawyer in the course of his employment by defendant?

Referring to the text of OEC 503(2), the answer to that question is "no." The approach of the Court of Appeals majority is to treat the privilege as coextensive with the relationship between lawyer and expert. However, the rule protects communications, not relationships. The statute does not define "communication." We therefore give the word its plain, ordinary meaning. *See PGE*, 317 Or at 611 (words of common usage given plain, natural, and ordinary meaning, unless special meaning intended). A "communication" is an "*interchange* of thoughts or opinions." *Webster's Third New Int'l Dictionary*, 460 (unabridged ed 1993) (emphasis added). As that definition makes clear, ideas and opinions can have an existence separate from the fact that they are *capable* of being or even that they *are* communicated, *i.e.*, "interchanged."

■ In this case, Myers did communicate to Bouck about his observations and opinions regarding the crash, and the state clearly was not entitled, under the rule, to put before the jury, either directly or indirectly, the fact of those communications. Neither would it be permissible to put questions to the expert that would inform the trier of fact, indirectly, as to what those communications were. But the fact of that communication and its content are distinguishable from Myers's opinions and observations that were *not derived* from any communication between Myers and defendant or Bouck. OEC 503 extends a privilege to any such communication, but that is as far as the words of the rule can reach. On their face, the words of the rule do not extend to any opinion that the expert is able to segregate from the communication.

■ Defendant argues that OEC 503(2) is concerned with the substance of a confidential communication and, therefore, pertains to the content of Myers's report to Bouck, not just to the form of that report or the fact that it was made. Defendant suggests, moreover, that *State v. Keenan / Waller*, 307 Or 515, 771 P2d 244 (1989), provides "context" on that point, in that it contains *dicta* to the effect that, when disclosure of information about a communication would amount to disclosure of the substance of the communication, that information falls within the privilege. Defendant's argument misses the point on the present facts, which involve an opinion that was not based on any confidential communication. OEC 503(2) clearly applies to any confidential communications between Myers and defendant's lawyer. However, that does not mean that the substance of Myers's opinion, which Myers would hold even if he never had reported it to defendant's lawyer, also necessarily is privileged. On its face, OEC 503(2) does not extend so far.

The Court of Appeals based its different construction of OEC 503(2) on certain pre-Oregon Evidence Code cases and on a general pronouncement that Oregon has codified certain aspects of the work-product doctrine in OEC 503. *Riddle*, 155 Or App at 531-32 n 1. The court noted that the privilege and doctrine have been treated as interrelated in

other jurisdictions[2] and suggested that the Legislative Commentary to OEC 503 invokes the work-product doctrine by stating that the privilege applies to "an expert who is hired to assist in rendering legal advice or to help in the planning and conduct of litigation, but not one employed to testify as a witness." *Id.*, *quoting* Legislative Commentary to OEC 503, *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence*, 209-10 (3d ed 1996). The first point, even if true, necessarily relies on cases that do not purport to construe OEC 502(3) or to follow this court's statutory construction paradigm. They are not controlling. With respect to the second point, the Legislative Commentary places certain nontestifying experts into the category of persons described at OEC 503(1)(e) whose *communications* with a lawyer or client are privileged under OEC 503(2). The Commentary in no way suggests that the nontestifying experts themselves, or their opinions and analyses that may be segregated from any such communications, also are insulated by the privilege. Neither point relied on by the Court of Appeals supports that court's "incorporation" theory.

The Court of Appeals also relied on a number of pre-Oregon Evidence Code cases—primarily *Brink*. However, neither *Brink* nor any of the other cases discussed by defendant or the Court of Appeals supports a construction of OEC 503(2) that differs from the one that we have suggested.

*Brink* arose out of a county condemnation proceeding. The plaintiffs were dissatisfied with the amount fixed as damages for the taking of their land and filed a complaint against the county in circuit court. In the course of the trial, the plaintiffs called to the stand an appraiser, Kolberg, who had been employed by the county to evaluate the property in question but who had not been asked to testify for the county. The county objected, on grounds that are not entirely clear from the opinion, that Kolberg could not be required to testify for the plaintiffs. The trial court indicated that it would permit the plaintiffs to call Kolberg, but that it would not force Kolberg to give his expert opinion. On the stand, Kolberg

---

[2] *See, e.g., Hickman v. Taylor*, 329 US 495, 67 S Ct 385, 91 L Ed 451 (1947) (recognizing work-product "privilege" for memoranda, statements, and mental impressions of attorney that did not fall within attorney-client privilege).

stated that he had investigated the property and had made a written report of his findings to the county. When asked to produce the report, Kolberg said that he would not produce it unless ordered to do so by the court. The plaintiffs then asked Kolberg if he had made an appraisal, and Kolberg stated that he only had made an estimate of the damages. When the plaintiffs asked about the amount that Kolberg had estimated, the county objected, and the court asked Kolberg if he would be willing to give his opinion. Kolberg testified that he was not, and some discussion followed as to whether the court already had ruled against the plaintiffs pursuing that line of questioning. Ultimately, the court stated that, in any event, the particular question was objectionable in form, because a witness cannot give an opinion with respect to damages. *Brink*, 224 Or at 508-14. The trial court suggested that there might be some "proper method of approach toward the adducing of the testimony in this matter" and added that it would be glad to adjourn to chambers to clarify that point. *Id.* at 514. The plaintiffs indicated that they had no further questions, and Kolberg was excused. Subsequently, the jury returned a verdict that awarded the plaintiffs an amount that was only slightly higher than the amount that the county originally had offered. The plaintiffs appealed, assigning error to the exclusion of evidence that they had sought to elicit from Kolberg. *Id.* at 508.

On appeal, this court held that the trial court's final ruling—that Kolberg could not be asked to testify directly as to the amount of the plaintiffs' damages—was correct and adequately explained, and that, after that ruling, the plaintiffs' failure to make an offer of proof or otherwise to press for Kolberg's opinion undermined their claim of error. *Id.* at 516. The court then went on to offer a second justification for the exclusion of Kolberg's testimony. After noting that Kolberg had been employed to evaluate the property by the county and that he had communicated "in regard to certain data relative to this problem" with counsel, *id.* (internal quotation marks omitted), the court said:

"A communication made under the circumstances described by defendant's counsel would fall within the privilege extended to a client for communications with his lawyer. A

communication '*by any form of agency* employed or set in motion by the client is within the privilege.' "

*Id.* at 516-17 (italics in original; citations omitted; underscoring added).

Defendant contends that, in view of the facts of this case, the foregoing statements necessarily reflect the view that defendant espouses, *viz.*, that an expert's opinion itself is a confidential communication within the attorney-client privilege, if that opinion was formed while in a party's employ. In so arguing, however, defendant ignores the remainder of the *Brink* court's explanation:

"But the privilege is not available to the client if the *document* which is claimed to be the privileged communication was prepared by the client's agent in the regular course of business without reference to an existing or threatened lawsuit. * * * Plaintiffs contend that the *report* sought to be shown in the case at bar was made under such circumstances. The record indicates that the contrary is true. * * * We have, then, an existing or threatened lawsuit at the time Kolberg's *report* was made to defendant or to its counsel, and the *report* was made for use in connection with the litigation. As we have said, this was sufficient to bring the *report* within the privilege."

*Id.* at 517 (citations omitted; emphasis added).

It is clear from the repeated references to the "document" and "report" in the foregoing paragraph that the *Brink* court's comments about privilege were directed at Kolberg's written report to the county. That report is an item that would fall squarely within the privilege under our construction of OEC 503(2), *i.e.*, the report was a communication by Kolberg to the county and most likely was considered confidential. Defendant's suggestion to the contrary notwithstanding, *Brink* does not hold that Kolberg's *opinion* necessarily was privileged, and that case does not persuade us that Oregon's pre-OEC law regarding the attorney-client privilege differs in that respect from the construction of OEC 503(2) that we have proposed.[3]

---

[3] In so holding, we acknowledge that the *Brink* court initially spoke in terms of a "basis for excluding Kolberg's *testimony*." *Brink*, 224 Or at 514 (emphasis added). However, we are persuaded that, in light of the court's repeated references to

We are equally unpersuaded that the other cases cited by the parties have any relevance, for purposes of this case, respecting the meaning of OEC 503(2). For example, defendant relies on a footnote in *State v. Brown*, 297 Or 404, 432 n 21, 687 P2d 751 (1984), that suggests that a criminal defendant may search for a friendly polygraph examiner and then can prevent the state from offering any evidence or commenting about the examination if it goes badly. But that footnote occurs in the context of a wholly unrelated discussion about a defendant's state of mind during a polygraph test; it does not address the issue that is before us.

■    We have rejected defendant's and the Court of Appeals' various theories. None overcomes our reading of the text of the rule and its focus on "communication." Neither is there any contextual material that bears on the interpretive issue before us. We conclude that the meaning of OEC 503(2) is clear at the first level of interpretation. If an expert originally worked for a party and can be deemed to be a representative of that party's lawyer, then OEC 503(2) extends a privilege to any confidential information or statements that the lawyer communicated to the expert, as well as to the fact of and content of the expert's confidential communications (*i.e.*, written or oral reports) to either the client or the lawyer. However, OEC 503(2) does not render the expert *per se* incompetent to testify on behalf of another party about segregated information or opinions that the expert has formed without regard to any confidential communication.

■    Defendant contends that, even if OEC 503(2) does not permit him to have Myers's opinion excluded as privileged, Myers's opinion qualifies as "attorney work product" and should have been excluded on that ground. Defendant notes that many federal cases have recognized that lawyers often must rely on investigators or other agents in their preparations for trial, and therefore have extended the doctrine to materials prepared by such investigators and agents. For

Kolberg's report, that initial reference to "testimony" is not meaningful. Nor, we might add, does *Brink* include any discussion that would support the Court of Appeals' theory that the attorney-client privilege incorporates some component of the work-product doctrine. In fact, the *Brink* court expressly declined to consider whether the work-product rule had any application to the case. *Id.* at 518-19.

example, defendant quotes from *United States v. Nobles*, 422 US 225, 238-39, 95 S Ct 2160, 45 L Ed 2d 141, 154 (1975):

> "At its core, the work-product doctrine shelters the mental process of the attorney, providing a privileged area within which he can analyze and prepare his client's case. But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself."

Defendant points out, too, that the doctrine has been used in other jurisdictions not only to preclude discovery of reports and materials generated by a nontestifying expert in the course of his or her employment by the opposing party, but to exclude any use of the expert's conclusions and opinions. *See, e.g., United States ex rel Edney v. Smith*, 425 F Supp 1038 (EDNY 1976), *aff'd* 556 F2d 556 (2d Cir 1977) (so holding).

Although cases from other jurisdictions can be instructive, they are not binding on this court. The testimony at issue is not excludable on the basis of the work-product doctrine unless such an application of that doctrine is dictated in some Oregon source of law. *See* OEC 402 (all relevant evidence is admissible except as provided by Oregon Evidence Code, United States and Oregon Constitutions, or Oregon statutory or decisional law). We already have discussed and rejected the suggestion that some relevant aspect of the work-product doctrine is incorporated into the Evidence Code as part of OEC 503(2).

Defendant suggests that another statute, ORS 135.855(1), is relevant. That statute provides, in part:

> "The following material and information shall not be subject to discovery under ORS 135.805 to 135.873:
>
> "(a) *Work product*, legal research, records, correspondence, reports or memoranda *to the extent that they contain the opinions, theories or conclusions of the attorneys, peace officers or their agents* in connection with the investigation, prosecution or defense of a criminal action."

(Emphasis added.) Defendant contends that ORS 135.855(1)(a) shows that, in Oregon criminal cases, work product includes any opinion formed by a lawyer's agent (*i.e.*, an expert hired by a lawyer) in connection with the lawyer's investigation, prosecution, or defense of the underlying criminal action. However, for the reasons that follow, we are not persuaded that ORS 135.855(1)(a) is proper authority for excluding Myers's trial testimony in this case.

The most immediate problem with the statute is that, by its terms, it pertains only to *discovery* under ORS 135.805 *et seq*. At least on its face, it does not appear to make any provision for an evidentiary exclusion. *Amicus* Oregon Trial Lawyers' Association suggests that that apparent limitation cannot reflect the actual state of the law: "It would seem axiomatic," *amicus* argues, "that if the disclosure of such 'information' were protected from discovery before trial, it would surely be protected from disclosure at trial." The accuracy of that axiom is not self-evident to this court, and defendant has not offered any concrete demonstration that ORS 131.855(1)(a), which speaks to pretrial matters, also is directed at protecting work product from disclosure at trial. To the contrary, we think that the specific, limited scope of ORS 135.855(1)(a) defeats *amicus*'s argument. *See State v. Hartfield*, 290 Or 583, 589, 624 P2d 588 (1981) (holding that scope of separate paragraph of ORS 135.855(1) extended only to pretrial discovery). Although *Hartfield* dealt with ORS 135.855(1)(c), a different exemption from pretrial discovery than the one at issue here, its analysis and the commentary upon which that analysis relies appear to be applicable equally to ORS 135.855(1)(a). We hold that ORS 135.855(1) focuses on pretrial discovery and does not speak to matters outside of that scope.[4]

We turn, next, to the Oregon decisional law, to determine whether there is separate authority for excluding the testimony at issue on work-product grounds. We know of only one case from this court, *Nielsen v. Brown*, 232 Or 426, 374

---

[1] Defendant also argues that he is entitled to have Myers's testimony excluded as work product under ORCP 36 B(3), the civil law parallel to ORS 135.855(1)(a). We reject that suggestion, because ORS 135.855(1) is the specific statute governing this topic.

P2d 896 (1962), that discusses that question, and it does not advance defendant's cause.

In *Nielsen*, the plaintiff in a personal injury action indicated that she wished to call as a witness a doctor whom the defendant's lawyer had hired to examine the plaintiff and render an opinion as to the extent of her injuries. The defendant moved to exclude the doctor's testimony on grounds of attorney-client privilege, protection of attorney work product, and general unfairness. This court rejected all three of those theories as a basis for preventing the doctor from testifying.

The *Nielsen* court's comments with regard to the defendant's work-product theory began by describing and quoting with apparent approval from the leading federal case on attorney work product, *Hickman v. Taylor*, 329 US 495, 67 S Ct 385, 91 L Ed 451 (1947). The court then made a number of comments that suggest that an expert's work and his or her ultimate opinion with respect to a problem do not fit comfortably into the concept of attorney work product. *Nielsen*, 232 Or at 435-36 (citing *Grand Lake Drive In, Inc. v. Superior Court*, 179 Cal App 2d 122, 129, 3 Cal Rptr 621 (1960)). Later, the *Nielsen* court added:

> "We are not required to determine in this case whether on the trial a party may compel his adversary to produce the report of an expert employed by the latter. The question here is whether the expert can be called as a witness by the party who did not employ him and compelled to testify concerning his investigation, examination, etc., and express his opinion on a question within his professional knowledge. Neither the *Hickman* case nor any other that we have seen is authority for the proposition that the information and knowledge in the mind of the expert must be kept there and away from the jury on the theory that they are the work product of the lawyer."

*Nielsen*, 232 Or at 436-37.

Defendant points out, correctly, that the *Nielsen* court expressly confined its holding to the facts that were before it and denied any intent to decide what the rule should be with respect to experts who are hired to investigate an

engineering or other kind of problem. *See id.* at 444-45 (limiting holding in that manner). That caveat, however, does not diminish the message that the decision conveys—that the *Nielsen* court disapproved of the notion that the independent thought of an expert becomes the work product of the attorney who hires the expert. More importantly, even if *Nielsen* cannot be read as rejecting in all circumstances the idea that the opinion of a nontestifying expert might be excluded under a work-product theory, it certainly cannot be held up as authority *in favor* of such an exclusion.

■■    We conclude that there is no absolute privilege, arising either out of OEC 503, the work-product doctrine, or this court's cases, that prevents an expert whom a litigant has employed to investigate a factual problem from testifying for the other side as to the expert's thoughts and conclusions that are segregated from confidential communications.[5] However, we still must consider defendant's argument that, under the particular facts of this case, the trial court incorrectly allowed Myers to testify regarding his opinion. Defendant stresses that there is undisputed evidence in the record that Bouck disclosed to Myers at least one statement that defendant had made to Bouck, as well as Bouck's own alternative theories of the case. Defendant argues that, when there is evidence that an expert has heard or received such information, his or her testimony *necessarily* will be affected by it, even if the expert denies that the information affected his or her opinion. Defendant suggests, in other words, that when there is any evidence that the expert has been exposed to confidential communications or attorney work product in the course of his or her employment by a party, a trial court must exclude that expert's testimony altogether if the party claims privilege.

■■    We do not agree. Whether an expert's testimony will refer to, disclose, or be affected by confidential communications or work product or, instead, can be segregated from

---

[5] We note in passing that the rule that we identify here is a minority one, although it has the strong endorsement of a leading expert in the field of evidence. *See* Edward J. Imwinkleried, *The Applicability of the Attorney-Client Privilege to Non-Testifying Experts: Reestablishing the Boundaries between the Attorney-Client Privilege and the Work Product Protection*, 68 Washington U L Q, 19, 28-30 (1990) (discussing rule).

both is a question of fact, albeit a sometimes subtle and delicate one. When we are satisfied that a trial court correctly understands the applicable legal principles, we review the court's determination in that regard as we would any question of preliminary fact, *i.e.*, we will uphold the trial court's determination if there is evidence in the record to support it. *State v. Carlson*, 311 Or 201, 214, 808 P2d 1002 (1991).

As we explained earlier, there is evidence in the record in this case that Bouck had related to Myers at least one statement that defendant had made in confidence and that Bouck had discussed several potential defense theories with Myers. Bouck also testified that Myers had stated that he would make an independent investigation and that he would base his opinion solely on the physical evidence in the police records and his own observations. Although defendant suggested to the trial court the possibility that Myers's opinion might contain Bouck's work product, in that it might be shaped by Bouck's discussion of his theories, the trial court rejected that as unlikely, in view of Myers's level of expertise. The trial court determined and, on the record before us, there is evidence to support that determination, that, although Myers had been exposed to confidential communications or attorney work product, his testimony could and would be wholly segregated from those matters. There was no objection or argument during Myers's testimony that Myers's actual testimony violated the trial court's strictures or was derived in any way from anything that Bouck had told Myers. The trial court did not err.

▪▪ We emphasize the limited nature of our ruling. We hold only that, under OEC 503(2)(a), the lawyer/expert relationship does not automatically disqualify an expert who was retained by one party from testifying for some other party. That expert is disqualified from testifying, however, if his or her opinion discloses, either directly or indirectly, or is based on, any confidential communication between the lawyer, the client, and/or the expert. If an expert's opinion is so bound up with any such communication that the expert cannot, in the view of the trial court, segregate his or her opinion from some part of the confidential communication, then the expert should not be permitted to testify.

We also emphasize that the trial court has available a broad range of tools to assure that the privilege is protected. In making the preliminary factual determination, for example, a trial court itself may examine the expert, if doing so will enhance the court's ability to assure that the opinion is segregated from any confidential communication. And, after the expert is called as a witness, the trial court may use such familiar devices as orders *in limine*, cautionary instructions, and even grants of mistrial, if a party attempts to obtain any confidential information or communication through the expert's testimony.

The foregoing discussion demonstrates that the Court of Appeals' decision on the facts of this case was erroneous. It must be reversed, and the case must be remanded to the Court of Appeals to consider defendant's other assignment of error.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.