Argued and submitted November 28, 2012, affirmed on appeal and cross-appeal
August 28, 2013

Gregory G. ATKESON,
*Plaintiff-Appellant*
*Cross-Respondent,*

*v.*

T & K LANDS, LLC,
an Oregon limited liability company;
Tom Skeele, an individual;
and Kimberlee Skeele, an individual,
*Defendants-Respondents*
*Cross-Appellants,*

*and*

T. R. HUNTER REAL ESTATE, INC.,
an Oregon corporation, et al,
*Defendants.*

Lane County Circuit Court
160916234; A147936

309 P3d 188

Steven E. Turner argued the cause and filed the briefs for appellant-cross-respondent.

William H. Sherlock argued the cause for respondents-cross-appellants. With him on the answering and cross-opening brief was Hutchinson, Cox, Coons, DuPriest, Orr & Sherlock, P.C. With him on the reply brief was Hutchinson, Cox, Coons, Orr & Sherlock, P.C.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Hadlock, Judge.

HADLOCK, J.

**HADLOCK, J.**

Plaintiff, a dissatisfied purchaser of land, sued defendants—the LLC from which he purchased the property and two of the LLC's members—for rescission of the land-sale contract.[1] The trial court granted summary judgment to defendants and awarded them costs and attorney fees. Plaintiff appeals, arguing that disputed issues of fact preclude the entry of summary judgment in defendants' favor. Plaintiff also contends that the trial court erred in granting defendants' motion to compel discovery of certain material that plaintiff asserts was subject to an attorney-client privilege. Defendants cross-appeal, challenging the trial court's decision to award them less than the full amount of attorney fees requested. We reject without discussion the arguments raised in defendants' cross-appeal and, for the reasons set forth below, also reject the arguments raised by plaintiff on appeal. Accordingly, we affirm.

Most of the facts pertinent to our analysis are undisputed, but where there is a disagreement, we describe the facts in the light most favorable to plaintiff, the party opposing summary judgment. *See Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997) (describing summary judgment standard). In 2008, plaintiff searched for property on which he could build a vacation home and, during the course of that search, learned of a lot owned by defendant T & K Lands. A flyer described that lot, which abutted Siltcoos Lake in Dunes City:

> "Approx. 4 acre lakefront lot with a beautiful, cleared home site. The well is in, septic approved, and it has all underground utilities. Lot is graced by mature trees, a small steelhead/salmon stream, bridges, and a large covered deck. A wide, level nature trail goes back to the lake. Gated community of 8 homes is still under development."

---

[1] Although plaintiff initially also sued two real estate agents who had been involved with the sale, along with the company for which those agents worked, he later stipulated to a voluntary dismissal of his claims against those defendants. The real estate agents and company are, therefore, not parties to this appeal and our references to "defendants" generally relate only to the LLC and its two defendant members.

That flyer included pictures of those developments, which plaintiff described as follows:

"[T]here was a fence installed along the northern border of the property, there was a gazebo surrounded by paving stones on the bank of the creek, there was a large lawn area extending to the banks of the creek, there were two bridges spanning the creek that ran across the property in two locations, and there was a manicured trail leading through the woods to the shores of Siltcoos Lake."

Plaintiff decided to buy the lot, but he hired attorneys to research the property before he purchased it. Following an investigation by one of those attorneys, Weatherhead, the parties closed on the sale. In their purchase agreement, the parties acknowledged that plaintiff was "purchasing [the] property in 'as is' condition." The agreement included a statutory warranty deed urging plaintiff to research the permissible uses of the property.[2] The agreement also stated that plaintiff's purchase was subject to, among other things, his "review and approval of all zoning and other land use laws, ordinances, restrictions and regulations that affect the development of the property."

Plaintiff asserts that, shortly after the sale was finalized, he discovered certain conditions that restricted the ways in which he could use the property, including that (1) the property sat within a wetland inventory, so plaintiff needed a wetland delineation to determine whether he could build a home, (2) the bridges and gazebo had been built without required permits, (3) some improvements violated a 50-foot riparian setback from a creek on the property, and (4) the nature trails had been installed in wetland areas. Moreover, Dunes City declared that the improvements on the property were nuisances that plaintiff had to cure. Consequently, the city ordered plaintiff to remove the fence, lawn, paving stones, gazebo, and bridges; he also had

---

[2] The statutory warranty deed stated, in pertinent part:

"Before signing or accepting this instrument, the person transferring fee title should inquire about the person's rights ***. This instrument does not allow use of the property *** in violation of applicable land use laws and regulations. Before signing or accepting this instrument, the person acquiring fee title to the property should check with the appropriate city or county planning department *** to verify the approved uses of the lot or parcel ***."

to replant native vegetation along the creek. Plaintiff made those changes "at substantial personal expense." According to plaintiff, "[a]t no time before [he] purchased the subject property" did defendants or Weatherhead—or anybody else—inform him about the wetlands or the other conditions described above.

After he learned of what he deemed "the full extent of the problems with the property," plaintiff asked defendant T & K Lands to rescind the agreement, and he also instituted a malpractice claim against Weatherhead. When the company declined his request for rescission, plaintiff initiated this litigation. Almost a year later, the Oregon Department of State Lands released its wetland delineation report for the property, which established that the wetlands would not prevent plaintiff from building a vacation home.

Plaintiff's complaint included a single claim for rescission against defendant T & K Lands, which encompassed three counts representing alternative bases for relief: mutual mistake, innocent misrepresentation, and intentional misrepresentation. Plaintiff also named two of T & K Lands' members as defendants, arguing that they had alter ego and direct liability. According to plaintiff, he had relied on defendants' affirmative misrepresentations and material omissions in deciding to purchase the property. Plaintiff also asserted, alternatively, that all parties had held mistaken beliefs about the property that "were so material that—had the parties known the truth—the contract would not have been made." Plaintiff insisted that Weatherhead had not told him about the problems with the property, despite having been hired to perform due diligence. For all of those reasons, plaintiff claimed, he was entitled to rescission of the land-sale contract.

During pretrial discovery, defendants sought "[a]ny and all documents relating to due diligence investigation of the disputed property prior to plaintiff receiving title ***," and, at plaintiff's deposition, asked him about research that had been performed by Weatherhead, who no longer represented plaintiff. Plaintiff initially declined to produce the documents or to answer the questions, asserting his attorney-client privilege. Defendants then moved to compel production

of communications between plaintiff and Weatherhead, as well as deposition answers from plaintiff. In response, plaintiff maintained that the documents and his related deposition testimony were protected, and thus not properly subject to discovery.

The trial court granted defendants' motion to compel as to "due diligence activities undertaken" by Weatherhead and his firm, explaining that, in its view, "the institution of this suit represent[ed] an implied waiver by plaintiff of the attorney-client privilege" as it concerned Weatherhead's investigation and consequent communications with plaintiff. A few weeks later, defendants deposed Weatherhead, who testified that, before the sale closed, he had known that the lot was within the Dunes City wetlands inventory, had expected that structures such as the gazebo or bridges would require permits but had known that "there were no permits of any kind issued" for the property, had "suspected that the trails would have to be removed," and had known that "at least * * * 50 feet on either side of the creek would have to go back to natural, wherever there was a wetland[] it would have to go back to natural." Weatherhead also testified that he had told plaintiff about those issues.

Defendants subsequently moved for summary judgment on plaintiff's claim for rescission, advancing several theories. In particular, defendants argued that plaintiff had known about the potential problems with the property, either directly or by imputation of knowledge possessed by his attorney, Weatherhead. In response, plaintiff argued, among other things, that Weatherhead's knowledge could not be imputed to him. The trial court granted defendants' motion without a detailed explanation, awarding summary judgment to defendant T & K Lands on plaintiff's claim for rescission and also dismissing plaintiff's claims against the defendant LLC members, which depended on the rescission claim.

On appeal, plaintiff first assigns as error the trial court's ruling on defendants' motion to compel discovery of materials protected by the attorney-client privilege. In his second assignment of error, plaintiff challenges the trial court's ruling on defendants' summary judgment motion,

arguing that disputes of material fact preclude summary judgment in defendants' favor. In particular, plaintiff asserts that his own testimony contradicted that of Weatherhead regarding what information Weatherhead had given him. Plaintiff also argues that it would be inequitable to impute Weatherhead's own knowledge about the property to plaintiff, as defendants are not the sort of "innocent third parties" for whose benefit the imputed-knowledge rule developed. In response, defendants largely reiterate the arguments they made below.

We first consider the trial court's ruling on defendants' summary judgment motion.

> "On review of a trial court's grant of summary judgment, we view the record in the light most favorable to the party opposing summary judgment to determine whether there is any genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law."

*Pincetich v. Nolan*, 252 Or App 42, 46, 285 P3d 759 (2012). We address only one of the theories that defendants advanced in support of their motion, as we find it dispositive. For the reasons set out below, we agree with defendants that Weatherhead's knowledge about difficulties with the lot properly is imputed to plaintiff and that, on this record, that imputed knowledge defeats plaintiff's rescission claim as a matter of law.

Before addressing that imputation analysis directly, however, we pause to explain that the analysis is independent of the issues that plaintiff raises in his first assignment of error, which concerns the compelled disclosure of materials that plaintiff contends are protected by the attorney-client privilege. OEC 503(2) gives an attorney's client a privilege "to refuse to disclose and to prevent any other person from disclosing" certain specified "confidential communications made for the purpose of facilitating the rendition of professional legal services to the client":

> "(a)   Between the client or the client's representative and the client's lawyer or a representative of the lawyer;

"(b)   Between the client's lawyer and the lawyer's representative;

"(c)   By the client or the client's lawyer to a lawyer representing another in a matter of common interest;

"(d)   Between representatives of the client or between the client and a representative of the client; or

"(e)   Between lawyers representing the client."

Consistent with the rule's emphasis on protected communications, plaintiff argues in his first assignment of error that the trial court erred by ordering him to disclose certain pre-closing and post-closing communications.

Plaintiff's focus on the compelled disclosure of *communications* between him and his attorneys is appropriate. The Supreme Court has emphasized that OEC 503(2) protects only certain types of communications made for the benefit of an attorney's client, not other information that can be described independently of those communications:

"[OEC 503(2)] does not define 'communication.' We therefore give the word its plain, ordinary meaning. A 'communication' is an 'interchange of thoughts or opinions.' *Webster's Third New Int'l Dictionary* 460 (unabridged ed 1993) * * *. As that definition makes clear, ideas and opinions can have an existence separate from the fact that they are capable of being or even that they are communicated, *i.e.,* 'interchanged.'"

*State v. Riddle*, 330 Or 471, 477, 8 P3d 980 (2000) (emphasis and citation omitted).

The specific question in *Riddle*, a criminal case, was whether the defendant could "prevent an accident reconstruction expert, whom the defense originally had hired to investigate the accident on which the criminal charges were based, from testifying for the state about an opinion that the expert formed while in the defendant's employ." *Id.* at 473. The Supreme Court rejected the defendant's argument that the attorney-client privilege extended to protect any testimony by that expert "about the *subject* that defendant had hired him to investigate." *Id.* at 477 (emphasis in original). Rather, the court held, OEC 503(2) protected only "any confidential information or statements that the lawyer communicated to

the expert, as well as to the fact and content of the expert's confidential communications * * * to either the client or the lawyer." *Id.* at 482. As the court emphasized, the rule "does not render the expert *per se* incompetent to testify on behalf of another party about segregated information or opinions that the expert has formed without regard to any confidential communication." *Id.* Ultimately, the court held that the trial court had not erred in ordering the expert to testify about his opinion of the cause of the automobile accident at issue. *Id.* at 475, 487.

Although this case involves information possessed by a party's attorney, not a party's expert witness, *Riddle* still is instructive. The only evidence about Weatherhead's knowledge that we need consider in conjunction with the imputed-knowledge analysis is Weatherhead's deposition testimony about what he knew, which was not dependent, itself, on the content of any privileged attorney-client communications. Indeed, plaintiff has not argued that Weatherhead's statements regarding his own knowledge about the property disclosed the content of any of Weatherhead's privileged pre-investigation and post-investigation *communications* with plaintiff on that topic. Accordingly, we can resolve the summary judgment question without addressing the attorney-client privilege issues raised in plaintiff's first assignment of error, which relate solely to the actual communications between plaintiff and his lawyers.[3]

We return to plaintiff's contention that the trial court erred in granting summary judgment to defendants. To obtain rescission on his theories of mutual mistake or innocent or intentional misrepresentation, plaintiff would have had to prove, among other things, that he had not known about the problems with the property when he purchased it. That is, for either type of misrepresentation claim, plaintiff would have had to prove that he did not know that defendants had inaccurately portrayed the property. *See Soursby v. Hawkins*, 307 Or 79, 84-87, 763 P2d 725 (1988) (to obtain rescission on an innocent misrepresentation theory,

---

[3] Plaintiff does not argue that Weatherhead's testimony should have been protected from discovery under the work-product doctrine embodied in ORCP 36B(3).

the plaintiff must have reasonably relied on the misrepresentation, which is permissible "if discovering the truth would [have been] unreasonably difficult" for the plaintiff); *Johnsen v. Mel-Ken Motors, Inc.*, 134 Or App 81, 89, 894 P2d 540 (1995) (one element of an intentional-misrepresentation claim is the plaintiff's "ignorance of [the misrepresentation's] falsity"). And, to prevail on his claim of mutual mistake, plaintiff would have had to prove that both he and defendants had been mistaken about the property's characteristics. *Murray and Murray*, 120 Or App 216, 219, 852 P2d 204 (1993) (a "mutual mistake" claim for rescission of a contract can succeed only if both parties were mistaken about the pertinent facts).

Here, defendants contend that the undisputed facts preclude plaintiff from establishing that he was unaware of the problems with the property. That argument depends on application of the "imputed knowledge" rule, under which an agent's knowledge generally is imputed to the agent's principal. *See Benson v. State of Oregon*, 196 Or App 211, 217, 100 P3d 1097 (2004). Thus, defendants argue, plaintiff knew—as a *legal* proposition—about the property's actual condition because Weatherhead's knowledge about the property must be imputed to him. To evaluate that argument, we must determine whether Weatherhead's knowledge properly is imputed to plaintiff and, if so, whether that imputed knowledge defeats plaintiff's rescission claim as a matter of law. We address those questions in turn.

First, we conclude that Weatherhead's knowledge must be imputed to plaintiff. A relationship between an attorney and a client is one of agent and principal. *Free v. Wilmar J. Helric Co.*, 70 Or App 40, 43, 688 P2d 117 (1984), *rev den*, 298 Or 553 (1985). And "[a]n agent's knowledge acquired within the scope of the agency is imputed to the principal, regardless of whether the agent actually communicates that knowledge to the principal." *Benson*, 196 Or App at 217. That imputed-knowledge rule is described in the *Restatement (Third) of Agency* § 5.03 (2006) as follows:

> "For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or

has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal, unless the agent

"(a)   acts adversely to the principal as stated in § 5.04, or

"(b)   is subject to a duty to another not to disclose the fact to the principal."

Neither of those stated exceptions to the imputed-knowledge rule applies here.[4] It follows that, because plaintiff hired Weatherhead to research the property's condition, knowledge that Weatherhead acquired through that research properly is imputed to plaintiff.

Nonetheless, plaintiff seeks to escape the imputed-knowledge rule on the ground that the rule "should only be used to protect an innocent third-party from an agent's failure to communicate information from the third-party to the principal." Based on that assertion, plaintiff argues that imputation is not available in this case because defendants are not innocent third parties, but rather "are alleged to have committed fraud."

Plaintiff's argument is based on this court's decision in *Benson*, in which we held that the imputed-knowledge rule did not apply in a case in which a negligent government defendant sought to escape liability in tort on the ground that the plaintiff had not filed a tort claim notice within 180 days after he knew or should have known that the defendant had caused him injury, as the pertinent statute required. 196 Or App at 219. The defendant in *Benson* argued that, although the plaintiff himself had not had the requisite knowledge more than 180 days before he filed his tort claim notice, an investigator who had been hired by the plaintiff's lawyer *did* have that knowledge more than 180 days before the notice was filed, and that knowledge should be imputed to the plaintiff, making his claim time barred. In rejecting that argument, we focused on the equitable nature of the imputed-knowledge doctrine and stated that, "[w]here the party seeking to invoke the imputation is not itself innocent, the

---

[4] The "adverse interest" exception to the imputed-knowledge rule has been described in Oregon cases. *E.g.*, *FDIC v. Smith*, 328 Or 420, 429-30, 980 P2d 141 (1999); *State Farm Fire v. Sevier*, 272 Or 278, 302-03, 537 P2d 88 (1975).

equitable foundation beneath the rule crumbles, leaving the parties on more equal footing." *Id.* Plaintiff contends that *Benson* applies here, because defendants are not "innocent."

Plaintiff reads *Benson* too broadly. Our decision in that case was based on an unusual combination of factors, including that it involved an agent who had been hired only for purposes of litigation (not, as in this case, for purposes of assisting with an underlying transaction with the third party), an argument that this court should extend the imputed-knowledge doctrine to apply to knowledge held by *sub*agents (something, we explained, that Oregon courts had not done), and established culpability by the defendant, which apparently did not purport to be "innocent." *Id.* at 218-19. For all of those reasons, "we decline[d] to extend the rule of imputation so that it applie[d] between plaintiff and the subagent[.]" *Id.* at 219. Given the unusual set of circumstances that contributed to our holding in *Benson*, that opinion cannot fairly be read to mean that—in all circumstances—*only* "innocent third parties" can invoke the imputed-knowledge rule.

Given the facts of this case, we conclude that application of the imputed-knowledge rule is equitable and appropriate. This litigation involves an arms-length real estate transaction in which one party, plaintiff, hired a lawyer specifically to perform due diligence as to the condition of the property for sale. Everybody involved in the transaction was entitled to rely on the existence of that principal-agent relationship, including the expectation that the agent would pass on all pertinent information to his principal and that—even if he did not transmit the information—the principal would be charged with that knowledge. Nothing is inequitable about imputing the knowledge of an attorney hired to perform due diligence on a real estate transaction to that attorney's client, as reflected in an illustration from the *Restatement (Third) of Agency*:

> "P retains A to purchase Blackacre for P from S. A learns that neighboring structures obstruct the scenic view from portions of Blackacre. Based on statements previously made to P by S, P believes that Blackacre enjoys unobstructed scenic views. A does not tell P what A has learned

and purchases Blackacre for P. P seeks to rescind the purchase on the basis that P believed Blackacre's scenic view to be unobstructed. Notice of the fact of the obstruction, known to A, is imputed to P. P may have a claim against A."

*Restatement* § 5.03 illustration 19. The imputed-knowledge rule applies similarly in this case, with the result that the knowledge that Weatherhead obtained in performing due diligence on the property properly is imputed to plaintiff.

Finally, we consider whether Weatherhead's imputed knowledge defeats plaintiff's claim for rescission as a matter of law. Plaintiff argues that he is entitled to rescission because he did not know about the wetlands and certain other problems with the property. But the record includes evidence that Weatherhead knew about all of those difficulties with the property before the sale closed. Specifically, Weatherhead testified at his deposition that he knew, pre-closing, that (1) the lot was within the Dunes City wetlands inventory, (2) "this was a wetlands delineation area" and he did not specifically know where the wetlands were on the property, (3) structures like the gazebo or the bridges would likely require permits and "no permits of any kind" had issued for the property, (4) the nature trails might have to be removed, and (5) "at least * * * 50 feet on either side of the creek would have to go back to natural," as would any wetlands.

Despite that evidence, plaintiff contends that two pieces of competing evidence suggest that Weatherhead had *not* known about the problems with the property before the sale closed. He asserts that a jury could infer such lack of knowledge from a letter that Weatherhead sent him on the day of closing, which "is silent on these problems" and that a September 2008 letter written by another lawyer at Weatherhead's firm—Draneas—"claims that Weatherhead 'verified that there were no outstanding issues with the City regarding the property.'"[5]

We reject plaintiff's contention that the two referenced letters create a genuine dispute about whether Weatherhead

[5] Because plaintiff himself relies on those attorney-client communications in an attempt to create a genuine dispute of fact regarding Weatherhead's personal knowledge, he has waived the privilege at least for that limited purpose.

in fact knew about the problems with the property before plaintiff closed on the sale. At least under the circumstances present in this case, the fact that Weatherhead did not refer to each of those problems in one pre-closing letter to his client (a fax sent on the day of closing) is not enough, standing alone, to support an inference that he lacked information about the difficulties. The letter does not purport to provide a comprehensive discussion of the property, and only speculation could lead a factfinder to decide, based on that letter, that Weatherhead had lacked knowledge of the wetland delineation and other problems of which plaintiff now complains.

Nor does the September 2008 letter create a genuine dispute of material fact regarding the extent of Weatherhead's knowledge pre-closing. In that letter, under a heading titled "Land Use Violations," Draneas stated that Weatherhead had "verified that there were no outstanding issues with the City regarding the property." Standing alone, that statement might support plaintiff's contention that Weatherhead had been unaware of the difficulties with the lot. Read in context, however, Draneas's statement unambiguously relates only to Weatherhead's earlier ignorance that the improvements on the lot (the gazebo, bridges, and trails) "might constitute land use violations"—apparently under the city code—as nobody had filed complaints about them. That statement cannot reasonably be read to suggest that Weatherhead was unaware of the fact that the property was classified as a wetland or that no permits had been obtained for the improvements. To the contrary, the letter explicitly refers to the attorneys' pre-closing awareness of "the wetlands situation" and the need for a "determination of the scope of the wetlands," which might affect septic-system approval and the location of the gazebo.

Thus, the Draneas letter—like the pre-closing fax from Weatherhead to plaintiff—does not create a genuine dispute regarding whether Weatherhead knew of the problems with the property, particularly those related to the wetlands, before closing. Accordingly, even viewing the record in the light most favorable to plaintiff, we conclude that there is no genuine dispute of material fact regarding Weatherhead's knowledge. Because that knowledge properly

is imputed to plaintiff, it follows that there is no genuine dispute regarding *plaintiff's* knowledge. That is, on this record, no factfinder could find that plaintiff and his agents were ignorant of the wetland classification and need for a wetland delineation, the riparian setback, and the lack of permits for the improvements on the property. Because such ignorance is an element of each of the three theories underlying plaintiff's rescission claim, defendants were entitled to summary judgment on that claim, and the trial court did not err by ruling in their favor.

As noted above, given our disposition of plaintiff's second assignment of error, we do not reach his first. Plaintiff does not contend that he is entitled to any remedy for the compelled disclosure of allegedly privileged attorney-client communications other than reversal of the grant of summary judgment to defendants. But our resolution of the summary judgment issue does not depend on any of the allegedly privileged communications, except to the limited extent that plaintiff has waived the privilege in an attempt to create a dispute regarding Weatherhead's pre-closing knowledge. *See* 258 Or App at 383 n 4. Accordingly, even if the trial court erred in ordering plaintiff to disclose privileged communications—a question on which we express no opinion—that error was harmless.

Affirmed on appeal and cross-appeal.