Argued and submitted September 24, 2009, affirmed November 3, 2010, petition for review denied April 7, 2011 (350 Or 230)

## PORT OF PORTLAND,
a port district,
*Plaintiff-Respondent,*

*v.*

## OREGON CENTER FOR ENVIRONMENTAL HEALTH,
a domestic nonprofit corporation;
and Jane H. Harris,
*Defendants-Appellants.*

Multnomah County Circuit Court
060606786; A137929

243 P3d 102

Maureen Leonard argued the cause and filed the briefs for appellants.

William F. Gary argued the cause for respondent. With him on the brief were James E. Mountain, Jr., C. Robert Steringer, and Harrang Long Gary Rudnick, P.C.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Ortega, Judge.

ORTEGA, J.

**ORTEGA, J.**

Defendants appeal a general judgment that granted declaratory relief to plaintiff and declared material exempt from disclosure under the Inspection of Public Records Law, ORS 192.410 to 192.505.

The material at issue is, in essence, a joint defense agreement between several entities that were designated by the federal Environmental Protection Agency (EPA) as potentially responsible parties (PRPs) for the cleanup of an area in the lower Willamette River commonly referred to as the Portland Harbor Superfund Site. Defendants requested that plaintiff Port of Portland (Port) disclose the agreement pursuant to the public records law. The trial court determined that the agreement was exempt from disclosure under the general exemption for material "otherwise privileged" under Oregon law. Specifically, the trial court concluded that the agreement fell within Oregon's attorney-client privilege for confidential communications among parties "in a matter of common interest." We affirm.

## I. FACTS

The following facts are undisputed. In 2000, the EPA listed a portion of the lower Willamette River on the National Priorities List under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). CERCLA mandates a remedial investigation and feasibility study (investigation) of listed sites, which serves to assess site conditions and evaluate alternatives to the extent necessary to select a remedy for the pollution. 40 CFR § 300.430(a)(2) (2008). The EPA identified numerous entities, including the Port, as PRPs and sent letters notifying those parties of their potential liability. Subsequently, the Port and several of the other PRPs formed the Lower Willamette Group (LWG or group) and through each group member's counsel negotiated and entered into the agreement that is at issue here.

Although the specific contents of the agreement remain undisclosed to defendants and the general public, the parties acknowledge that the agreement serves at least three

purposes: to implement a coordinated approach to the investigation, to prepare for expected litigation, and to set forth a formula by which costs associated with the investigation and litigation will be shared. The LWG also provided the agreement to other PRPs and encouraged them to join the group and share in the costs of the investigation. The LWG required each entity that received the agreement to first sign a confidentiality agreement, which prohibited that entity from disclosing the terms of the agreement or terms of membership in the group to any outside entity. Some of the entities that received the agreement ultimately did not join in the group or sign the agreement. In addition, the EPA sent correspondence to certain PRPs that had not joined the LWG, in which the EPA informed those parties that the investigation had begun, and urged those PRPs to join in the LWG's efforts.

Defendants, a public interest group and its executive director, sought disclosure of the agreement through a public records request. The Port refused to disclose the agreement, claiming that it was exempt from disclosure under several provisions of OEC 503, including the exemptions for records prohibited from disclosure by federal law, Oregon's attorney-client privilege, and the work-product doctrine. In response, defendants petitioned the Multnomah County District Attorney for an order that would require disclosure of the agreement. *See* ORS 192.460(1). The district attorney ordered the Port to disclose the agreement.[1] The Port refused, and filed a complaint in Multnomah County Circuit Court seeking a declaratory judgment that the agreement is exempt from disclosure. Eventually, the parties filed cross-motions for summary judgment.

In its motion for summary judgment, the Port maintained that the agreement is exempt from disclosure under ORS 192.502(8) as a record protected under federal law, and

---

[1] Before defendants filed their public records request, the *Oregonian* sought disclosure of the agreement from the Port. The Port refused to disclose the agreement, and the *Oregonian* petitioned the Multnomah County District Attorney for an order requiring disclosure. The district attorney granted the petition. Although the record in this case does not reflect how that issue was finally resolved, it is clear that the Port did not disclose the agreement. Nevertheless, in the order requiring disclosure of the agreement to defendants, the district attorney relied on the reasoning in the order granting the *Oregonian*'s petition.

under ORS 192.502(9) pursuant to Oregon's attorney-client privilege or work-product doctrine. Defendants' cross-motion for summary judgment essentially asked the court to rule that the Port's claimed exemptions were barred as a matter of law.

After oral argument and the trial court's *in camera* review of the agreement, the court ruled that the agreement was protected by Oregon's attorney-client privilege because all of the PRPs, including the signatories to the agreement, had a common interest in the subject of the agreement—the investigation and clean-up of the harbor. The court concluded that the agreement and any communications leading up to the agreement were made for the purposes of facilitating the rendition of legal services, and that the circulation of the agreement to PRPs outside the LWG did not waive the privilege because the LWG took care to preserve the agreement's confidentiality. The court then entered a general judgment granting declaratory relief to the Port. Defendants appeal, assigning error to the court's grant of summary judgment and its denial of defendants' cross-motion for summary judgment.

## II. ANALYSIS

■ In a public records case, we review a grant of summary judgment on cross-motions to determine if there are any disputed issues of material fact and if either party was entitled to prevail as a matter of law. *Hood Technology Corp. v. OR-OSHA*, 168 Or App 293, 295, 7 P3d 564 (2000); *see also Kluge v. Oregon State Bar*, 172 Or App 452, 457, 19 P3d 938 (2001). If both the granting of one motion and the denial of the other are assigned as error, then both rulings are subject to review. *Cochran v. Connell*, 53 Or App 933, 939-40, *rev den*, 292 Or 109 (1981). Although we review the record in the light most favorable to the nonmoving party, *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997); ORCP 47 C, our determination of whether the agreement at issue in this case is privileged information is a question of law that requires us to examine the agreement.

■ On its face, this appeal implicates an inherent tension between the policies driving Oregon's public records law and the attorney-client privilege. The public records law

encapsulates the "strong and enduring policy that public records and governmental activities be open to the public." *Jordan v. MVD*, 308 Or 433, 438, 781 P2d 1203 (1989). Accordingly, we narrowly construe any exemptions from disclosure and the public body asserting the exemption has the burden of sustaining that action. *Kluge*, 172 Or App at 455; *see also* ORS 192.490(1).

■ On the other hand, the attorney-client privilege promotes the full disclosure of information by clients to their attorneys by protecting that communication. In doing so, the privilege invokes the principle that lawyers can "act effectively only when fully advised of the facts by the parties whom they represent," and maintains that a client's confidential communications to his lawyer cannot be revealed without his permission. *State v. Jancsek*, 302 Or 270, 274, 730 P2d 14 (1986).

■ Because the public records law includes an exemption for attorney-client privileged communications, we must proceed in light of the general rule that favors disclosure of public records, but we recognize that the purposes of the attorney-client privilege likewise must be upheld, because the privilege promotes " 'broader public interests in the observance of law and administration of justice[,]' " and that " 'sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.' " *State ex rel OHSU v. Haas*, 325 Or 492, 500, 942 P2d 261 (1997) (quoting *Upjohn Co. v. United States*, 449 US 383, 389, 101 S Ct 677, 66 L Ed 2d 584 (1981)).

■■ We begin with the language of the applicable statutes. ORS 192.420(1) provides that "[e]very person has a right to inspect any public record of a public body * * * except as otherwise expressly provided by ORS 192.501 to 192.505." ORS 192.502(9)(a) exempts from disclosure "[p]ublic records or information the disclosure of which is prohibited or restricted or otherwise made confidential or privileged under Oregon law." As relevant to this appeal, OEC 503(2) provides:

"A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:

"* * * * *

"(c) By the client or the client's lawyer to a lawyer representing another in a matter of common interest[.]"

In general, whether a communication is protected by the attorney-client privilege depends on whether the communication is a "confidential communication" under OEC 503(1)(b),[2] whether the communication is made for the purpose of facilitating the rendition of professional legal services to the client as provided in OEC 503(2), and whether the communication is between persons described in OEC 503(2)(a) through (e).[3] *OHSU*, 325 Or at 501. In this case, the communication is claimed to be between parties "in a matter of common interest." OEC 503(2)(c). Accordingly, we must decide if the agreement is a confidential communication made for the purpose of facilitating the rendition of professional legal services to the client, and if the communication occurred between the Port or the Port's lawyer and lawyers representing others in a matter of common interest.

■ Initially, we conclude that the agreement is a confidential communication within the meaning of OEC 503(2). The agreement was prepared by attorneys for their clients and sent to counsel for other members of the group. Although

---

[2] OEC 503(1)(b) defines "[c]onfidential communication" as "a communication not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication."

[3] OEC 503(2)(a) through (e) protects confidential communications

"(a) Between the client or the client's representative and the client's lawyer or a representative of the lawyer;

"(b) Between the client's lawyer and the lawyer's representative;

"(c) By the client or the client's lawyer to a lawyer representing another in a matter of common interest;

"(d) Between representatives of the client or between the client and a representative of the client; or

"(e) Between lawyers representing the client."

an attorney cannot render a document attorney-client privileged simply by receiving it, where the document memorializes confidential communications and consists of those communications, the document itself can constitute a confidential communication. *Cf. State v. Riddle*, 330 Or 471, 478, 8 P3d 980 (2000) (stating that expert opinions not derived from a communication between the expert and the client or attorney were not privileged, and a communication is an interchange of thoughts or opinions). The agreement in this case was drafted by the attorneys for their clients and negotiated through counsel. It also represents the sum of negotiations and communications between the LWG members' attorneys and memorializes the common approach agreed to by the group for the investigation and potential litigation.

■ The application of the privilege also depends on "the intent of the parties to shield the communication from disclosure and the purpose for which the communication is made." *State v. Ogle*, 297 Or 84, 87, 682 P2d 267 (1984). The undisputed facts demonstrate that the Port and the other members of the LWG intended to maintain the confidentiality of the agreement. As the trial court acknowledged in its order, terms within the agreement demonstrate that the group intended to keep confidential not only the agreement's terms, but also information gathered pursuant to those terms. The agreement was only disclosed to other PRPs and such disclosures were made only after the receiving party executed a separate written confidentiality agreement. That is, every party that received the agreement agreed to keep the terms of the agreement confidential regardless of whether they signed the agreement or not. Further, each PRP agreed to return or destroy all copies of the agreement if it determined that it did not want to participate in the group or sign the agreement.

■ Next, we address whether the agreement was made for the purpose of facilitating the rendition of professional legal services. In *OHSU*, the Supreme Court recognized that a communication is made for the purpose of facilitating the rendition of legal services if it makes it easier for an entity to make use of legal advice or services. 325 Or at 502. There, the court determined that "[a] lawyer who conducts an internal investigation concerning a client's potential legal liability,

provides the client with a written report on the results of that investigation, and advises the client on ways to resolve problems uncovered in the investigation renders professional legal services to the client." *Id.* at 501-02. Similarly, the court concluded that a statement made by a faculty member to other employees about the report that resulted from the investigation was attorney-client privileged because it was necessary to inform some individual employees of the content of the legal advice so that the employees could aid in carrying it out. *Id.* at 502.

Here, defendants focus their attention on the cost allocation information contained in the agreement. In short, defendants contend that the cost allocation information does not involve the rendition of legal advice because that information does not relate to any legal strategy or defense. In support, defendants cite cases from other jurisdictions that have held that a fee agreement, the amount of a fee charged, or the general nature of services performed by an attorney are not subject to the attorney-client privilege. Alternatively, defendants characterize the cost allocation information in the agreement as purely business or "policy" advice, so as to remove it from the cloak of privilege.

 We conclude that the agreement facilitates the rendition of professional legal services, including those provisions that set forth the cost allocation among the group. As an initial matter, defendants' argument that the cost allocation information is not legal advice fails to recognize that OEC 503 does not require that privileged information be legal advice, only that it be made for the purpose of facilitating the rendition of professional legal services. Organization of the LWG and the negotiation and drafting of the agreement by the group members' attorneys was triggered by the EPA's liability notification letters. The agreement itself represents a pact between members of the LWG to jointly undertake an investigation that is an initial step in the CERCLA process. The agreement facilitates the joint investigation of the harbor with an eye towards preparing for and defending against future litigation. The allocation of costs in the agreement relates directly to the LWG's ability to investigate the pollution. That investigation and the anticipated litigation of liability for the pollution would certainly require the rendition of legal services, and the agreement, including the cost

allocation information, will help to facilitate those actions. The potential for future litigation is well documented in the record, including correspondence from the EPA and the Oregon Department of Environmental Quality to the Port and other PRPs.[4] Accordingly, the agreement is a confidential communication "made for the purposes of facilitating the rendition of professional legal services." Our conclusion that the entire agreement is a confidential communication also disposes of defendants' argument that the Port should separate exempt and nonexempt material under ORS 192.505.

Finally, we discuss defendants' argument that the agreement does not fit within the intended meaning of OEC 503(2)(c) because the Port and the other PRPs with which the agreement was shared do not have a "common interest" sufficient to apply the attorney-client privilege. Defendants contend that there is no common interest in this case and, even if there were, any privilege was waived when the Port disclosed the agreement to other PRPs that ultimately did not sign the agreement. Defendants also point out that the membership of the group has fluctuated over time. Finally, defendants assert that the EPA sent letters to PRPs that were not part of the group, and those letters demonstrated that the EPA participated in discussions related to the agreement that would constitute a waiver of any existing privilege.

Oregon appellate courts have not yet addressed the attorney-client privilege in the context of "matter[s] of common interest." As such, the question presented poses an issue of statutory interpretation, and our task is to determine what the legislature intended. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). We examine the text and context of the statutory language at issue, and consider any legislative history offered by the parties. *State v. Gaines*, 346 Or 160, 172, 206 P3d 1042 (2009). If necessary, we will consider relevant canons of construction. *Friends of Yamhill County v. Yamhill County*, 229 Or App 188, 192, 211 P3d 297 (2009).

Defendants ask us to narrowly interpret the common interest privilege—contending, essentially, that parties

---

[4] We do not suggest that the attorney-client privilege is limited to communications made in the context of pending litigation. *See Klamath County School Dist. v. Teamey*, 207 Or App 250, 260, 140 P3d 1152, *rev den*, 342 Or 46 (2006).

claiming the privilege based on a common interest must have an "identical legal, and not solely commercial" interest.[5] Under that interpretation, defendants contend that, because the Port acknowledged that some members of the LWG may end up litigating against each other, they cannot have a common interest. Defendants also define the interest claimed by the Port as "fairly sharing clean up costs" and dispute that such an interest is subject to the attorney-client privilege.

The Port argues that, to the contrary, the "community of interest" depends on whether the parties have a similar legal interest with respect to the subject of the privileged communication. Thus, the Port contends that, even if the parties have both adverse and common interests, the privilege attaches if the particular communication relates to the common interest.

We begin our analysis with the statutory phrase "common interest." "[W]ords of common usage typically should be given their plain, natural, and ordinary meaning." *PGE*, 317 Or at 611. The plain meaning of the language in OEC 503(2)(c) suggests that the interest between parties must be shared, but not necessarily identical. In this context, "common" means "of or relating to a community at large[,]" or "possessed or manifested by more than one individual[,]" or "marked by or resulting from joint action of two or more parties[.]" *Webster's Third New Int'l Dictionary* 458 (unabridged ed 2002). In short, nothing within the relevant definitions of

---

[5] In support of their argument, plaintiffs cite other jurisdictions that have similarly limited the common-interest component of the attorney-client privilege. *See, e.g., Katz v. AT & T Corp.*, 191 FRD 433, 437 (ED Pa 2000) (concluding that, to claim the common-interest privilege, the parties had to prove an "identical legal, and not solely commercial, interest"); *Allendale Mut. Ins. v. Bull Data Systems,* 152 FRD 132, 140 (ND Ill 1993) (stating that a common interest "must be identical, not similar, and be legal, not solely commercial"). Nevertheless, there are a number of jurisdictions that have taken a more expansive view of the privilege, holding that the common interest privilege is not limited to those perfectly aligned on one side. *See, e.g., United States v. McPartlin*, 595 F2d 1321, 1336-37 (7th Cir), *cert den*, 444 US 833 (1979) (concluding that the privilege is not limited to situations where the parties' positions are compatible in all respects, but protects the "pooling of information" for any common defense purpose); *Hanover Ins. v. Rapo & Jepsen Ins. Services*, 449 Mass 609, 618, 870 NE2d 1105, 1113 (2007) (rejecting argument that the "requisite interests must be identical" and concluding that parties will rarely have identical interests). We do not find either line of cases particularly helpful to our disposition of the case before us.

"common" lends support to defendants' narrow construction of the statute.

Further, the legislative history supports a legislative intent in line with the plain meaning of the statutory language. The Legislative Commentary to OEC 503(2)(c) explained:

> "In a case in which lawyers represent different clients who have a common interest, Rule 503 allows each client a privilege as to the client's own statements. Thus, in 'joint defense' or 'pooled information' situations, if all clients resist disclosure, none will occur. However, if for some reason one client wishes to disclose the client's own statements made at joint conference, the person is permitted to do so. No privilege applies where there is no common interest to be promoted by joint consultation, and the parties, therefore, meet on a purely adversary basis."

Legislative Commentary to OEC 503, *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* § 503.02 (5th ed 2007). The commentary suggests that, in a "pooled information" case— like we have here—even if there are some adversarial aspects to a relationship between the parties, the privilege can apply as long as there is a common interest promoted by joint consultation. Some adversity is acceptable, but the key is that the communication furthers a common interest.

The Port has a common interest with the other members of the LWG, as well as the other PRPs with which the agreement was shared. Although defendants attempt to narrowly define the interest at stake as "fairly sharing the clean up costs," the interest at issue is broader than that. Instead, we view the LWG members' shared interest in the context of CERCLA and the anticipated litigation surrounding the cleanup of the harbor. As such, the undisputed facts reflect that all of the entities that have received the agreement were issued liability notice letters by the EPA that implicate them in the investigation and cleanup of the harbor. In addition, the PRPs share common adversaries in the anticipated litigation under CERCLA, including the federal government, the State of Oregon, and the regulatory agencies associated with each. Accordingly, in this case, the Port shares a sufficiently similar interest with the other PRPs to qualify under

the common interest privilege. In addition, the LWG has attempted to promote that common interest through the terms of the agreement.

Further, the LWG's sharing of the agreement with other PRPs who ultimately decided not to join the LWG or sign the agreement did nothing to affect the application of the attorney-client privilege in this case. As we previously discussed, the Port made specific attempts to ensure that the confidentiality of the agreement was preserved even by those that did not join the group. We have already determined that the agreement is a confidential communication, and the attorney-client privilege applies if there is a confidential communication made for the purpose of facilitating the rendition of professional legal services between a client or client's lawyer and the lawyer of another in a matter of common interest. All three elements are present in this case. Whether an entity ultimately signed on to the agreement does not matter, as long as the members of the LWG had a common interest at the time the agreement was shared, and the confidential communication attempted to further that interest. In this case, the potential liability of each PRP provided that interest.

Because we have concluded that the trial court did not err by granting summary judgment to the Port, we need not address defendants' assignment of error to the trial court's ruling that denied defendants' cross-motion for summary judgment.

Affirmed.